CHARLES A. NORWOOD and JUDY A. NORWOOD, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Norwood v. Commissioner
Docket No. 3108-79.
United States Tax Court
T.C. Memo 1983-755; 1983 Tax Ct. Memo LEXIS 30; 47 T.C.M. (CCH) 683; T.C.M. (RIA) 83755; December 19, 1983. Stephen G. Salley, for petitioners. Jane T. Dickinson, for respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' Federal income tax for the taxable years 1974 and 1976 in the amounts of $38,395.28 and $4,414.00, respectively. Some of the issues raised by the pleadings have been disposed of by agreement of the parties, leaving for decision whether petitioners are entitled to a *32 bad debt deduction under section 166. [1]
FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife, resided in Merritt Island, Florida, at the time the petition was filed in this case. Petitioners filed their joint returns for the years in issue with the Internal Revenue Service Center at Chamblee, Georgia. Charles A. Norwood (Mr. Norwood) is a real estate developer and general contractor engaged primarily in the construction of residential condominiums, and has been engaged in such activity since 1963. Mr. Norwood was an employee of Cornett Enterprises, Inc. ("CEI"), a Florida corporation initially wholly owned by C. W. Martin (Mr. Martin). CEI was an electing small business corporation under the provisions of subchapter S. During 1971, CEI constructed a 50-unit condominium project in New Symrna Beach, Florida, called Hacienda Number 1. As a result of Mr. Norwood's involvement in Hacienda Number 1, he received 35 percent of the stock in CEI. Sometime *33 in 1971 or early 1972, because of the success of Hacienda Number 1, Mr. Norwood and Mr. Martin made plans to construct another condominium project at New Symrna Beach called Hacienda Number 2. In July 1972, after Mr. Norwood and Mr. Martin had obtained financing for the project and after they had made an offer to purchase the property on which the project was to be built, Mr. Martin was killed in an automobile accident. Mr. Martin died intestate and consequently, his stock in CEI went to his two children. The children's stock was eventually purchased by Ida Pankey (Mrs. Pankey), Mr. Martin's mother, with Mr. Norwood remaining a 35 percent shareholder in CEI. Despite Mr. Martin's death, Mr. Norwood and Mrs. Pankey decided to go ahead with the plans to build Hacienda Number 2. They formed Cornett Construction Company, Inc. ("CCC") to build the project. CCC was also a Florida corporation which elected tax treatment as a small business corporation under the provisions of subchapter S. Mr. Norwood and Mrs. Pankey each owned 33-1/3 percent of CCC, with the remaining shares being owned by a number of investors. On November 2, 1972, Mr. Norwood incorporated a third Florida corporation, *34 Norwood Enterprises, Inc. ("NEI") to construct a 100-unit condominium project in Rockledge, Florida, called the Indian River Club Condominium ("Indian River"). Mr. Norwood owned 99 percent and Judy A. Norwood (Mrs. Norwood) owned 1 percent of the stock of NEI. Indian River was also a project that Mr. Norwood and Mr. Martin had planned together. Originally, they had contemplated that Mrs. Pankey would have an equity interest in Indian River. However, after her son's death, Mrs. Pankey decided she did not want to participate in the development of the project. Indian River was to be built on two parcels of land. One parcel was initially acquired from Maylee Realty Corporation by Mrs. Pankey, E. J. Martin (Mrs. Pankey's daughter), and E. J. Martin, as trustee (hereinafter collectively referred to as "Pankey et al.") for approximately $170,000. NEI purchased the property from Pankey et al. for $270,000. A part of the purchase price, $170,000, was financed with a loan from the construction lender, Citizens & Southern Realty Investors ("C&S"). The balance, $100,000, was secured by a second mortgage on the property given by NEI to Pankey et al. Mr. Norwood and Mrs. Pankey each *35 relied on Roger Dobson (Mr. Dobson), a certified public accountant, for tax and business advice. It was Mr. Dobson who suggested the $270,000 purchase price to the parties. After the parties had completed their negotiations, Mrs. Pankey asked Mr. Dobson to meet with her attorney, and have the attorney draw up the necessary documents with the agreed terms. Mr. Dobson advised Mrs. Pankey, and instructed the attorney, that petitioners should guarantee the note from NEI to Pankey et al. Mr. Dobson did not see the mortgage or the note after they were drafted by the attorney. The mortgage and note were executed on January 30, 1973, by Charles A. Norwood as president of NEI. Neither petitioner signed the mortgage or the note in a personal capacity or as a guarantor. The note was payable in three equal installments, the first payment being due and payable on January 30, 1974. On June 22, 1973, Pankey et al. entered into a mortgage modification agreement with NEI and Mr. and Mrs. Norwood, changing the terms of the mortgage and the terms for payment due under the note. The modification agreement provided in part: 1. The entire indebtedness plus accrued interest shall be due and *36 payable on January 30, 1974, if Cornett Construction Co., Inc. distributes to Charles A. Norwood on or before January 30, 1974, his share of profits in Hacienda Del Sol #2 in the sum of $65,000.00 or any sum in excess of this amount. 2. However, if such distribution to Charles A. Norwood is less than the sum of $65,000.00, a principal payment of $50,000.00 plus accrued interest shall be due and payable on January 30, 1974. The remaining principal balance and accrued interest shall be due and payable when the total of said distributions equal $65,000.00 to Charles A. Norwood but in no event later than January 30, 1975. 3. Charles A. Norwood and Judy A. Norwood, his wife, hereby jointly and severally guarantee the payment of the entire indebtedness as referred to and as modified herein to secure the promissory note. If the indebtedness shall not be paid promptly when due, Charles A. Norwood and Judy A. Norwood, his wife, promise to pay all such sums to the extent aforesaid, without notice or demand. Pursuant to the the terms of the agreements between the Norwoods and Pankey et al., and the direction of Mr. Norwood, distributions due Mr. Norwood were made directly to Pankey *37 et al. as follows: Date
Amount
From
January 4, 1974
$35,000.00
Cornett Enterprises
February 20, 1974
35,000.00
Cornett Construction
October 22, 1976
9,872.20
Cornett Construction
October 28, 1976
500.00
Cornett Construction
October 7, 1976
300.00
Cornett Construction
The parties also agreed that Mr. Norwood's stock in CEI and CCC would be used as collateral for the loan. Additional payments from Mr. Norwood to Pankey et al. were made on February 20, 1974, and October 28, 1976, in the amounts of $8,438 and 4,095, respectively. Eventually, Mr. Norwood paid off the entire amount of the note. NEI obtained a commitment from C&S to provide construction financing in the amount of $2,250,000 for Indian River. Pursuant to the terms of the commitment, petitioners were guarantors, jointly and severally, of all liabilities of NEI. The loan was closed on January 30, 1973. Subsequently, it became apparent that NEI would be unable to meet the payment terms of the loan, and that it was in need of additional funds. On October 19, 1976, C&S extended the maturity date of the notes, and made NEI an additional advance of $110,500. Petitioners were *38 also required to sign a Reaffirmation of Guarantee at this time. Indian River was constructed in two phases: the first phase consisted of 35 units and the second consisted of 65 units. The units were priced between $28,500 and $39,500. Construction began on the project in January or February of 1973, and was completed by mid-1974. In 1972 or early 1973, when the project was in the planing state, Mr. Norwood projected a profit of $500,000 from the construction of Indian River. However, by 1974 mortgage interest rates had risen several percentage points and the units were not being sold as quickly as Mr. Norwood had projected. The result was not only less income from the sale of units, but also larger than expected financing costs on NEI's construction loan. For example, Mr. Norwood had projected an interest expense of $200,000 on the construction loan; however, because units were not being sold and NEI was unable to close on the loans, approximately $715,000 in interest was ultimately paid to C&S. An additional interest charge of $95,000 due C&S on the construction loan went uncollected. At the end of 1974, approximately one-half of the 100 units had not been sold. By *39 1975, the economy began to improve, and Mr. Norwood hoped that the units would sell faster and at an increased sales price. However, the last of the Indian River units were not sold until 1978, at which time NEI liquidated. Even with the presumed improved economy in 1975 and beyond, as of 1974, both Mr. Norwood's and Mr. Dobson's cost projections indicated that NEI had already lost too much money to ever break even. On Schedule C, attached to their 1974 and 1976 returns, petitioners reported the income distributions Mr. Norwood received from CEI and CCC. Petitioners deducted on Schedule C, attached to their 1974 and 1976 returns, $70,000 and $10,672, respectively, as had debt deductions, and on their 1974 return, interest on the indebtedness of $8,438.36. These payments represent the amount petitioners paid Pankey et al. towards the satisfaction of the indebtedness during the years in issue. Respondent disallowed each of these claimed deductions with the following explanation: (c) It is determined that the bad debts shown on Schedule C of your income tax returns for the years 1974 and 1976 in the amounts of $70,000.00 and $10,672.00, respectively, are not allowable. These *40 payments to Mrs. Ida Pankey, et al., on the indebtedness of Norwood Enterprises, Inc., your wholly owned corporation, were contributions to capital to Norwood Enterprises, Inc. However, if it is found that these payments constitute loans to Norwood Enterprises, Inc., the debt is a non-business bad debt because the loans are personal loans and not created in connection with your trade or business. In the latter event, the losses would be subject to the limitations of section 1211 of the Internal Revenue Code. If a debt was intended, it has not been established that any amount became worthless during 1974 or 1976. Accordingly, income is increased $70,000.00 and $10,672.00 for the years 1974 and 1976, respectively. (d) It is determined that interest expense in the amount of $8,438.36 shown on Schedule C of your income tax return for the year 1974 is not allowable. Since the payment to Mrs. Ida Pankey, et al., on indebtedness of Norwood Enterprises, Inc. was not a payment incidental to an obligation of yours, no amount is allowable under section 163 of the Internal Revenue Code. Accordingly, income is increased $8,438.36 for 1974. *41 At the trial respondent stated as a further basis for his disallowance of the claimed deductions that the indebtedness was that of petitioners and that of the corporation. OPINION Section 166(a)(1) provides the general rule that "There shall be allowed as a deduction any debt which becomes worthless within the taxable year." Section 1.166-1(a), Income Tax Regs., provides that in order for a deduction to be allowable the debt must be owed to the taxpayer. Section 1.166-1(c), Income Tax Regs., states that "Only a bona fide debt qualifies for purposes of section 166." This regulation defines a bona fide debt as one "which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. * * * A gift or contribution to capital shall not be considered a debt for purposes of section 166." Whether a payment constitutes a valid loan is a question of fact upon which petitioners have the burden of proof. Smith v. Commissioner,370 F.2d 178 (6th Cir. 1966), *42 affirming a Memorandum Opinion of this Court. Respondent makes several alternative arguments in support of his position that the amounts claimed as bad debts by petitioners are not properly deductible. First, respondent contends that petitioners were not guarantors of the indebtedness of NEI to Pankey et al., because they did not sign the January 30 note in a personal capacity or as a guarantor. Furthermore, respondent contends that the June 22 mortgage modification agreement in which petitioners "guaranteed" the payment of the indebtedness is, in reality, a new agreement which personally obligated petitioners to Pankey et al. Therefore, according to respondent, petitioners are not entitled to a bad debt deduction because no indebtedness arose from NEI to petitioners and in fact the payment by petitioners of part of the cost of the property on which the Indian River condominiums were built was in effect a contribution by petitioners of capital to NEI. Next, respondent argues that even if we find that petitioners had guaranteed the indebtedness of NEI, petitioners' payments to Pankey et al. represented capital contributions. Respondent's fourth argument is that assuming NEI was *43 indebted to petitioners, petitioners did not prove that the debts became worthless during the years in issue. Finally, respondent argues that if we find that petitioners are entitled to a bad debt deduction, it is a nonbusiness debt under section 166(d). Turning to respondent's first argument, petitioners counter that they were indeed guarantors of NEI's indebtedness to Pankey et al, and that the January 30 documents fail to reflect this simply because of Mrs. Pankey's attorney's inadvertent omission. Petitioners rely on Mr. Norwood's and Mr. Dobson's testimony to support their position. Respondent argues that without the testimony of the attorney and Mrs. Pankey, petitioners failed to prove it was the parties' intent to have petitioners guarantee NEI's indebtedness. Furthermore, respondent asserts that, in any event, under Florida law, a contract of guaranty is required to be in writing. We will address this latter argument first. As respondent correctly points out, Florida law requires that for a guaranty of indebtedness to be enforceable it must be in writing. Fla. Stat. sec. *44 725.01; [2]Juliana, Inc. v. Salzman,181 So. 2d 3 (Fla. Dist. Ct. App. 1965). Petitioners acknowledge this general rule, but contend, also correctly, that this rule applies only to executory contracts. Dionne v. Columbus Mills, Inc.,311 So. 2d 681 (Fla. Dist. Ct. App. 1975). Hence, petitioners argue, because they executed in full their responsibilities under the agreement, the statute is inapplicable. Black's Law Dictionary defines an "executory contract" as one which "has not as yet been fully completed or performed. A contract the obligation (performance) of which relates to the future." In the instant case, if we assume arguendo that petitioners intended to act as guarantors, they were obligated to pay money in the future in the event of NEI's default. Thus, contrary to petitioners' assertion, they had not satisfied in full their responsibilities when the agreements were entered into on January 30, 1973. These agreements were executory, and therefore to be enforceable, they *45 were required to be in writing. See, e.g., Cassella v. Tiberio,150 Ohio St. 27, 80 N.E.2d, 426, 429 (1948). ("Certainly, a written and signed promise to pay money comes within the classification of an executory contract so far as the promisor is concerned.") See also 17 C.J.S., Contracts, sec. 7 (1963). So regardless of the parties' intentions, [3] under Florida law, because petitioners did not sign the January 30, 1973, documents as guarantors, they were not obligated on NEI's indebtedness to Pankey et al. Nevertheless, petitioners argue that the execution of the modification agreement on June 22, 1973, was a subsequent written ratification of an oral guarantee which removed the original agreement from the ambit of the Statute of Frauds. Also, petitioners argue that, as guarantors, they succeeded by subrogation to all the rights of the creditor (Pankey et al) after they made the payments. See Putnam v. Commissioner,352 U.S. 82 (1956); *46 Sherman v. Commissioner,18 T.C. 746 (1952). Therefore, when petitioners made payments to Pankey et al. in 1974 and 1976, there arose a commensurate indebtedness of NEI to petitioners. While we agree with petitioners' recitation of the law, we do not agree that the law applies to the factual situation in this case. We are not convinced that petitioners became guarantors of NEI's indebtedness upon execution of the June 22 modification agreement. Granted, paragraph 3 of the agreement provides that petitioners "hereby jointly and severally guarantee the payment of the entire indebtedness" and that if the indebtedness is not paid promptly when due, petitioners "promise to pay all such sums to the extent aforesaid." However, the "aforesaid" terms are provided for in paragraphs 1 and 2 of the agreement. These terms provide that the entire indebtedness plus accrued interest shall be due and payable on January 30, 1974, if Mr. Norwood's distributions from CCC are equal to or in excess of $65,000. However, if the amount of Mr. Norwood's distribution is less than $65,000, a principal payment of $50,000 plus accrued interest shall be due and payable on January 30, 1974, with *47 the balance due when Mr. Norwood's distributions from CCC equal $65,000, or at the latest, January 30, 1975. In other words, the amount payable to Pankey et al. on specific dates was contingent on CCC's distributions to Mr. Norwood. In our opinion, the provisions indicate that as of June 22 the parties no longer regarded NEI as the primary obligor, but rather Pankey et al. looked to Mr. Norwood personally for payment of the debt. We find support for our conclusion from the fact that Mr. Norwood had his own funds of $35,000 due him from CEI paid to Pankey et al. on January 4, 1974. This payment was made prior to the due date of NEI's first installment provided for in the original mortgage and note and of the first payment provided for in the modification agreement. Cf. Wincorn v. United States, an unreported case ( N.D. Tex. 1961, 7 AFTR 2d 657, 61-1 USTC par. 9212); 5 Mertens Law of Federal Income Taxation, sec. 28.70, p.345 (1980). In sum, petitioners were not guarantors of NEI's debt, rather they were the primary obligors. Consequently, there was no bona fide debt owed to petitioners by NEI, and no right to subrogation existed. Furthermore, the June 22 *48 agreement was not a subsequent written ratification of an oral guarantee, but rather an entirely new agreement. For the first time in their reply brief, petitioners argue that if we hold that they were not guarantors, they should be entitled to a business loss under section 165(a) for the amounts paid to Pankey et al. See Burns Mfg. Co. v. Commissioner,59 F.2d 504 (9th Cir. 1932), affg. 21 B.T.A. 749. Section 165(a) provides that there shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. In the case of an individual, the deduction is generally limited to losses incurred in a trade or business or in a transaction entered into for profit. Section 165(c). In addition, the loss is deductible only in the year in which it is sustained, and a loss is sustained during the taxable year in which it occurs as evidenced by closed and completed transactions and as fixed by identifiable events occurring in such taxable years. Section 1.165-1(d)(1), Income Tax Regs.
*49 In the instant case, the record does not show that Mr. Norwood satisfied the trade or business requirement since the property on which he made payment was property used by his corporation. The indication is far more that Mr. Norwood made a contribution to the capital of NEI or was protecting his investment in NEI than that the payment was connected with his own trade or business. Also, we are not persuaded that the "loss" was evidenced by closed and completed transactions and fixed by identifiable events. Although the ultimate success of Indian River was in doubt in 1974 and 1976, units were still being sold in 1978. [4]
Since we have concluded that petitioners were the primary obligors on the indebtedness to Pankey et al., they are not entitled to deduct $70,000 and $10,672 *50 in 1974 and 1976, respectively, under section 166 or section 165. However, petitioners also claimed a deduction of $8,438.36 for interest they paid in 1974 on the indebtedness. Section 163(a) provides that "[t]here shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness." In view of our conclusion as above stated that petitioners were the primary obligors on the indebtedness paid to Pankey et al., they are entitled to their claimed interest deduction as an itemized deduction. Since we have held that petitioners are not entitled to a bad debt deduction, we need not consider the remainder of respondent's arguments. Because of issues disposed of by agreement of the parties, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years here in issue.↩
2. This section is Florida's codification of the Statute of Frauds.↩
3. At trial, respondent argued that the parol evidence rule precludes Mr. Dobson's testimony to the effect that the parties intended that petitioners guarantee the note. In view of our holding, we need not address this issue.↩
4. This Court has held that it will not consider issues first raised on brief and not appearing in the pleadings. McMaster v. Commissioner,69 T.C. 952, 956-957 (1978). Kate Froman Trust v. Commissioner,58 T.C. 512, 519↩ (1972). However, we need not decide whether the claimed "loss" raises a new substantive issue because of our disposition of the issue on its merits.